MELLE S. T. WERNER, Respondent, *v.* WILLIAM R. HEARST, Appellant.

*Negligence — proof sufficient to establish the ownership of a newspaper — presumption where a party possesses better proof than he offered — false statement as to age — school records as evidence of age — amendment on the trial — objection that a party is surprised thereby — when the amendment is only an amplification of allegations in the complaint.*

What evidence given upon the trial of an action, brought against a private individual to recover damages for personal injuries sustained by the plaintiff in consequence of a collision with a wagon used in the business of a newspaper, is sufficient to support a finding that the defendant was the actual owner of the newspaper, although the nominal title thereto was in a corporation, considered.

The effectiveness of any proof to sustain the contention of the party producing it is always dependent, in a measure, on the proof which it was in the power of the party to produce. He who withholds some evidence, while introducing proof of a less satisfactory character, raises a presumption that the part which he has withheld would tend to contradict the evidence which he has offered. A case, therefore, which might otherwise be strong may be rendered weak and practically unproven by the fact that proof of a higher grade which might have been procured was withheld.

The fact that on the trial of an action to recover damages for personal injuries, the plaintiff incorrectly testifies concerning her age, will not justify the reversal of a judgment entered upon a verdict in her favor unless it appears that the incorrect testimony was willfully, intentionally or falsely given.

*Quære,* whether school records showing the date of the plaintiff's admission to a normal school and the period of time that she had been a teacher in a public school are admissible to impeach the plaintiff's testimony concerning her age.

The allowance upon the trial over the defendant's claim of surprise of an amendment to the complaint setting forth an item of special damages resulting from the plaintiff's inability to act in her professional capacity as a lawyer, does not constitute reversible error where it appears that the defendant did not follow up his claim of surprise by moving for a postponement of the trial.

*Semble,* that the amendment might be sustained upon the theory that it was only an amplification of an allegation in the original complaint that the plaintiff was incapacitated from "performing her natural and accustomed avocations."

APPEAL by the defendant, William R. Hearst, from a judgment of the Supreme Court in favor of the plaintiff, entered in the office of the clerk of the county of Westchester on the 1st day of May, 1901, upon the verdict of a jury for $25,000, and also from an order bearing date the 29th day of April, 1901, and entered in said clerk's office, denying the defendant's motion for a new trial made upon the minutes.

*Clarence J. Shearn* [*B. F. Einstein* with him on the brief], for the appellant.

*Roger M. Sherman,* for the respondent.

GOODRICH, P. J. :

The complaint alleged the following facts : On May 14, 1897, the defendant was owner and publisher of a newspaper, and in and about the business of distributing and transporting, employed a wagon known as No. 47 and a driver named Polhemus. On that day the plaintiff was riding a bicycle on one of the city streets, when the wagon was negligently driven into collision with the

plaintiff, whereby she suffered great bodily injuries which incapacitate her from pursuing her natural and accustomed vocation and from child-bearing. At the trial the court allowed an amendment alleging that the plaintiff was a counselor at law and a lecturer in a law school, and that by the accident she was incapacitated from pursuing her said occupation, had been subjected to great expense for medical treatment, and that her disability would be permanent.

Defendant denied that on May 14, 1897, he was owner or publisher of a newspaper or that in or about the business of distributing or transporting it he employed or was the owner of the vehicle No. 47, or the employer of Polhemus. Defendant's brief contains the statement that " issue was joined on the question of the ownership of the newspaper and of the wagon and of the employment of the driver, and also on the genuineness of the plaintiff's alleged injuries ;" and it makes no argument as to the negligence of either party, so the question whether the negligence of the driver caused the injuries, and whether the plaintiff was guilty of contributory negligence need not be considered, leaving for discussion only the question of the ownership of the newspaper and vehicle, the employment of the driver by the defendant and the genuineness and extent of the plaintiff's injuries. The plaintiff recovered a verdict of $25,000, and the defendant appeals.

The first question relates to the ownership of the newspaper and wagon and the employment of the driver. At the close of the entire evidence the defendant moved for a dismissal of the complaint on the ground that there was no evidence showing that the defendant was the owner of the wagon or the employer of the driver, and as the court denied the motion and submitted the question to the jury, it is well to state with considerable detail the facts proven, in order to ascertain whether or not there was sufficient evidence to support the verdict.

It is claimed by the plaintiff that while the business was conducted nominally under the cover of corporate forms, the defendant was the actual proprietor, being the owner of all the stock except some nominal holdings by his employees to qualify them to hold corporate office; that he directed and controlled the business and the policy of the several newspapers hereinafter referred to, and was in fact the owner at the time of the accident.

The evidence discloses the following facts : Albert Pulitzer and others, in 1882, under the Manufacturing Corporation Act of February 17, 1848, filed a certificate of incorporation of " The Morning Journal Association," the object of which was stated to be to print, publish and sell a newspaper under the name of *The Morning Journal.* In 1888, Watkins and others filed another certificate of incorporation of the " Star Company," the object being stated to be the printing, publishing and selling of newspapers. On March 30, 1897, Clark and others filed another certificate of incorporation of the " New York Evening Journal Publishing Company," the object of which was to print, publish and distribute a newspaper or newspapers, and to buy, acquire and deal in all articles necessary to print, publish and distribute the same.

Upon the sides of the wagon which collided with the plaintiff were painted the words " New York Journal " and " Number 47." It was one of twenty purchased from Studebaker by a written order headed " The Journal Circulation Department " and signed " The New York Journal, per S. J. Richardson, Circulation Manager," and paid for by a check headed " New York Journal " and signed " New York Journal, by C. M. Palmer." Mr. Earl, cashier of the Nassau Bank, testified that the New York Journal had kept an account in that bank for about four years. (The trial began April 4, 1901.) The money was drawn on checks signed in print " New York Journal," and in writing underneath by H. M. Bicknell and E. H. Clarke, or W. Thompson. Neither the defendant, the Morning Journal Association, the Star Company, nor the Evening Journal Publishing Company had any other account in the bank. The method of dealing with the bank account is shown by several letters. One is dated March 5, 1897, addressed to the Nassau Bank, and reads :

" Regarding the account of the Morning Journal appearing in your bank, to the credit of which we wish to renew deposits and accounts, will you kindly honor such accounts when signed as per margin. Yours very truly,

" C. M. PALMER, *Treasurer.*
" By NEW YORK JOURNAL.
" By HENRY M. BICKNELL, *Accountant.*
" By W. B. PALMER, *Cashier.*"

The date of the first deposit was March 10, 1897. Two subsequent letters headed "New York Journal, W. R. Hearst," and dated respectively November 22, 1898, and May 19, 1900, and signed "Henry M. Bicknell, Cashier, N. Y. Journal," changed the required signatures in some respects. In September, 1900, a fund for the relief of the Galveston flood sufferers was instituted, of which the defendant was treasurer. Three checks are in evidence, given by subscribers to this fund to the order of "New York Journal" and one to the order of "Wm. R. Hearst." These checks were indorsed "Pay to the Nassau Bank of N. Y., or order, W. R. Hearst, N. Y. Journal Galveston Relief Fund," and were deposited in the bank account already referred to. A copy of the *New York Evening Journal*, dated May 14, 1897, was also put in evidence, on the first and last pages of which were the words "New York Journal. Evening. New York, Friday, May 14, 1897. The Evening Journal, W. R. Hearst."

There was also in evidence a certificate of the State Comptroller that there was no record in his office of reports filed by the Morning Journal Association, the New York Evening Journal Publishing Company or the Star Company, from November, 1895, to March, 1901, also a certificate of the county clerk of New York county that there was not filed in his office up to January, 1901, any annual report of the Star Company; that annual reports of the Morning Journal were filed in January, 1895, 1896, 1901, and of the New York Evening Journal Publishing Company in January, 1901.

The plaintiff contended that this was sufficient evidence to support her claim that the defendant was the actual owner of the several newspapers and of the wagon, No. 47, and employer of its driver. Neither the defendant nor the driver, who was present in court at the trial, nor Palmer, nor Bicknell, was called by the defendant as a witness. But Mr. Carvalho, who was one of the incorporators of the "New York Evening Journal Publishing Company," was called by the defendant. He testified that he was the "general manager of the *New York Journal*" and *Das Morgen Journal;* that his original connection with the Morning Journal Association was made in April, 1896; that it was engaged in printing the *Morning Journal*, the *New York Morning Journal* and

*Das Morgen Journal;* that the *New York Evening Journal* was started in September, 1896; that the *Evening Journal* was published in 1896 and was owned and distributed by the Morning Journal Association up to April 3, 1897; that the *Morning Journal* was printed and distributed by the Morning Journal Association up to April 1, 1897; that the name was changed during 1896 to the *New York Journal.*

On March 29, 1897, the " Morning Journal Association," by order of the board of directors, Mr. Hearst being then president and executing the bill of sale, in consideration of one dollar, transferred to Edward H. Clarke " the newspaper known as and called the evening edition of the *New York Journal* " with all its property; and Clarke, in consideration of $9,500, on April third, transferred the same to the " New York Evening Journal Publishing Company." On October 12, 1895, at a meeting of the directors of the " Morning Journal Association," Mr. Macklin, the former president of the company, resigned, and Mr. Hearst was elected as his successor. On April 1, 1897, at a special meeting of the " Morning Journal Association," the defendant being present as president and one of the stockholders, a resolution was passed that the newspaper the *New York Journal* and all the property and assets of the company except *Das Morgen Journal* be transferred to the " Star Company," in consideration of one dollar, and confirming the transfer of the *New York Journal* to Clarke, and on April eleventh the bill of sale was executed by Mr. Hearst, as president of the Morning Journal Association, and Mr. Clarke, as president of the " Star Company." It appears that of the three hundred shares of $500 each of the Morning Journal Association, Mr. Hearst was on the minutes of the meeting stated to be the owner of three hundred and sixty-six (sic), and Palmer and Chamberlain one share each.

The defendant also produced the minutes of the directors' meeting of the Star Company of April 1, 1897, at which Mr. Hearst was present, in which appears a resolution authorizing the purchase from the Morning Journal Association of the *New York Journal* and all the assets of the Morning Journal Association except *Das Morgen Journal,* for the consideration of one dollar and other valuable considerations, and that the president be authorized to execute the bill of sale, and further ratifying a sale to Stillman &

Hubbard of all the assets of the company except the *Morning Advertiser*, and its good will and the contract with the Associated Press, the consideration of such sale being the agreement by Stillman & Hubbard to indemnify the company against all debts existing April 1, 1897.

On April 1, 1897, by resolution of the directors of the Star Company, the name of the journal known as the *Morning Advertiser* was changed to *New York Journal and Advertiser*, and on April third Mr. Clarke resigned his office as president and trustee and Mr. Hearst was elected as his successor. Mr. Hearst owned all the stock of the Star Company, the Morning Journal Association and the Evening Journal Publishing Company except six or eight shares. Mr. Carvalho testified that after April 1, 1897, the copies of the Evening Journal were distributed by the Star Company in wagons which that company had purchased from the "Morning Journal Association" on that date; that prior to that date the drivers were employed by the "Morning Journal Association" and afterward by the "Star Company;" that prior to that date the Morning Journal Association deposited its receipts of money in two banks, the Wells, Fargo & Co. Bank and the Nassau Bank, under the name of the *New York Journal;* that after that date they were deposited by the Star Company, but in the Wells, Fargo & Co. Bank, in the name of the *New York Journal*, and in the Nassau Bank in the name of the "Morning Journal Association;" that the wages of the drivers were paid by the Star Company out of the Wells, Fargo & Co. bank account.

It also appears that at the first meeting of the directors of the Morning Journal Association a resolution was passed authorizing the issue of one-half of the stock of the company to Mr. Pulitzer for his services, preliminary and preparatory to the issuing of the *Morning Journal*, and for his services as manager and conductor for a period of ten succeeding years, that is, for services not then rendered and which might have been terminated by the death or disability of Mr. Pulitzer at any time within the ten years. This stock or its equivalent or other representative stock in the later companies is a portion of that held by the defendant. No dividends have ever been declared by any of the corporations, although there have been at times profits which have been used in a sinking

fund or in the improvement of the plant. Up to 1899, when the defendant was president, he borrowed money to the extent of several hundred thousand dollars, for the use of the papers, in some way, but in what way or from or by whom, is not disclosed. It does not appear when he became connected with the enterprise, nor in what capacity, except that in October, 1895, he was elected president of the Morning Journal Association.

This evidence raised a fair question of fact as to the identity of the real owner of the newspaper, which was being published at the time of the plaintiff's injury, and the employer of Polhemus, the driver, and this question was very fully stated by the court and submitted to the jury. Whatever might have been the purpose of the complicated transactions in the issues of stock of the several companies and the transfer of their properties, it is evident that the transactions have resulted in great doubt and have confused the real with the apparent ownership. The indiscriminate use of the bank account for the several newspapers and for the Galveston relief fund, the absence of any explanation, the failure to call the defendant to explain the transactions by which he acquired his interest in the business and the failure to call the driver, who was in court, and other persons intimately connected with the affairs, as witnesses to these transactions, might well give rise to a fair inference that their testimony would have been against the defendant's interest and in favor of the plaintiff on these questions. (*People* v. *Hovey*, 92 N. Y. 554.) The rule is well stated in 19 Am. & Eng. Ency. Law, 70, where it was said : " The effectiveness of any proof to sustain the contention of the party producing it always, in a measure, depends on the proof which it was in the power of the party to produce. He who withholds some evidence, while introducing proof of a less satisfactory character, raises a presumption that the part which he has withheld would not sustain but would rather tend to contradict the evidence which he has offered. A case, therefore, which would be otherwise strong, may be rendered weak and practically unproven by the fact that proof of a higher grade, which might have been produced, was withheld." (*Brown* v. *Schock*, 77 Penn. St. 477, 478).

Under such circumstances, the denial of a nonsuit on this ground and the submission of this question to the jury was eminently proper.

The other main question relates to the genuineness and extent of the plaintiff's injuries, that is, whether her condition at the time of the trial was the immediate and necessary result of the accident. Upon this subject there was much medical and other testimony. Plaintiff and her witnesses gave evidence tending to show that among the injuries resulting from the accident was a broken patella. No mention of this seems to have been made to her physician at the time of the accident, nor until many months afterwards, but there was testimony as to some injuries to the knees, and the course of the evidence was such as to enable the jury to infer that the patella was injured or, indeed, wholly broken by her fall. So also there was evidence tending to show that a diseased condition of the genital organs resulted from the accident, and that in a surgical operation which plaintiff claimed to be consequent upon the fall it became necessary to remove the ovaries and uterus. Fibroid tumors also were found in these parts. The defendant gave expert testimony tending to show that such tumors could not have been occasioned by the accident and the injuries received therefrom, but it does not appear that the removal of the organs was consequent solely upon the presence of these tumors. Again it is to be said that there was a fair question of fact for the jury upon this whole subject.

Plaintiff also testified that she was never pregnant to her knowledge. She was married in June, 1896, and in the following winter she and her husband consulted a physician, Dr. Laidlaw, for a serious uterine trouble, and an operation was performed which resulted in the removal of a four-months foetus. She was under anasthetics during the operation, and was never informed that she had been found in a pregnant condition. Defendant claims that this abortion accounted for much of her condition after the accident, and that most of her suffering and illness resulted therefrom. There was evidence that before the accident she was in good health, and that after the accident she was never restored to her original condition. Here again was contradictory evidence presenting a fair question for the jury.

Defendant claims that the plaintiff testified falsely as to her age. At the commencement of her examination and on her cross-examination, she testified that she was twenty-seven years of age at the time of the accident and thirty-one at the time of the trial in 1901,

making the date of her birth in 1870 ; that she was a teacher in one of the public schools in 1893, 1894 and 1895. The defendant produced the school records, showing that she entered the normal school in 1877, giving her age as sixteen, whereas, if actually born in 1870, she would have been but seven years of age at that time, and that she was a teacher in one of the public schools from 1881 to 1896. It does not appear that the question of age is material as bearing upon the extent of her injuries, or indeed in any other aspect of the case, except as to her veracity. Moreover, there is a grave question whether those records were admissible. (*Buffalo Loan, Trust & S. D. Co.* v. *Knights Templar, & M. M. A. Assn.*, 126 N. Y. 458.) She was admitted to the bar in 1894, was a lecturer in the Law School of the New York University in 1895 and 1896. Even if she incorrectly testified as to her age, that was a subject fairly before the jury who heard her testimony and noted her appearance, and such a mistake, unless shown to be willfully, intentionally or falsely made, hardly justifies a reversal of the judgment.

The other questions of the plaintiff's general health before, and her condition after, the accident were fully presented to the jury by the evidence. A careful and repeated examination of the voluminous record does not bring us to the conclusion that the verdict was against the weight of evidence.

There was no error in permitting the plaintiff to amend her complaint in order to set up special damages sustained by her in her professional capacity. While it is true that such a motion should usually be made at Special Term, it is not necessarily error to permit such an amendment at the trial. When the motion was made the defendant's counsel stated that they were surprised, but did not move for a postponement of the trial. They chose to proceed, and having done so, are precluded from a valid exception to the permission to amend. (See *Witrak* v. *Nassau Electric R. R. Co.*, 52 App. Div. 234, 238.)

In *Edge* v. *Third Ave. R. R. Co.* (57 App. Div. 29), cited by defendant's counsel, the plaintiff moved to amend by setting up the necessity of employing a person to do his work while plaintiff was incapacitated by the accident under investigation. Defendant's counsel expressed his surprise and asked to withdraw a juror, and

the request was refused. Besides, there had been a bill of particulars as to items of damage in which no mention of such services was made, and there was at the trial no evidence that the amount paid for the services was a fair compensation. Under these circumstances, we held that such an amendment at the trial was improper.

In the present case there was an allegation in the original complaint that the plaintiff was incapacitated from " performing her natural and accustomed avocations" (*sic*), and the amendment may be considered only as amplification of that allegation.

We have considered the exceptions to the admission and exclusion of testimony and the single exception to the charge argued in defendant's brief, but fail to find in any of them any reversible error.

The judgment should be affirmed.

Judgment and order unanimously affirmed, with costs.